# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BILL BOND SPIVA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-15-839-STE |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's applications for benefits under the Social Security Act. The Commissioner has answered and filed a transcript of the administrative record (hereinafter TR. ____). The parties have consented to jurisdiction over this matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The parties have briefed their positions, and the matter is now at issue. Based on the Court's review of the record and the issues presented, the Court **REVERSES** the Commissioner's decision and **REMANDS** the matter for further administrative development.

## I.     PROCEDURAL BACKGROUND

Plaintiff's applications were denied initially and on reconsideration. Following a hearing, an Administrative Law Judge (ALJ) issued an unfavorable decision. (TR. 11-

32). The Appeals Council denied Plaintiff's request for review. (TR. 1-3). Thus, the decision of the ALJ became the final decision of the Commissioner.

## II. THE ADMINISTRATIVE DECISION

The ALJ followed the five-step sequential evaluation process required by agency regulations. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); 20 C.F.R. §§ 404.1520 & 416.920. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 31, 2011, the alleged disability onset date. (TR. 14). At step two, the ALJ determined Mr. Spiva had severe impairments of degenerative disc disease; major depressive disorder; post-traumatic stress disorder (PTSD); anti-social disorder; chronic obstructive pulmonary disease (COPD); chronic pain syndrome; borderline intellectual functioning; and fibromyalgia. (TR. 14). At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (TR. 22).

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (TR. 30). The ALJ further found Plaintiff had the residual functional capacity (RFC) to:

> [L]ift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit for about 6 hours during an eight-hour workday and can stand and walk for about 6 hours during an eight-hour workday. The claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant is to avoid concentrated exposure to dusts, fumes, gases, odors, and poor ventilation. The claimant can understand, remember, and carry out simple, routine, and repetitive tasks. The claimant can respond appropriately to supervisors, coworkers, and usual work situations, but have occasional contact with the general public.

(TR. 25). Based on the finding that Mr. Spiva could not perform his past relevant work, the ALJ proceeded to step five. There, he presented the limitations from the RFC to a vocational expert (VE) to determine whether there were other jobs Plaintiff could perform. (TR. 67). Given the limitations, the VE identified three jobs from the Dictionary of Occupational Titles. (TR. 67-68). The ALJ adopted the testimony of the VE and concluded that Mr. Spiva was not disabled based on his ability to perform the identified jobs. (TR. 31-32).

### III.  ISSUE PRESENTED

On appeal, Plaintiff alleges the ALJ erred in failing to order a consultative examination for intelligence testing.

### IV.  STANDARD OF REVIEW

This Court reviews the Commissioner's final "decision to determin[e] whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotations and citations omitted).

**V.     ERROR IN FAILING TO ORDER A CONSULTATIVE EXAMINATION**

Mr. Spiva alleges that the ALJ erred in failing to order a consultative examination for intelligence testing. According to the Plaintiff, evidence in the record existed which indicated that he suffered from low intelligence. Based on these findings, a psychologist recommended additional intelligence testing. The testing never occurred. Mr. Spiva contends that in the absence of a valid I.Q. score, the ALJ could not properly evaluate whether Plaintiff had satisfied Listing 12.05. Mr. Spiva is correct.

**A.     Listing 12.05**

Listing 12.05 sets forth the requirements to determine whether an individual with an intellectual disability[1] is presumptively disabled. To satisfy Listing 12.05, "a claimant must meet the requirements of that listing's capsule definition as well as one of the four severity prongs for mental retardation as listed in the regulations." *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009).

The capsule definition for listing 12.05 states: "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404,

---

[1] Prior to August 1, 2013, courts and medical practitioners referred to "mental retardation" instead of "intellectual disability." On August 1, 2013, the SSA changed Listing 12.05 from "mental retardation" to "intellectual disability." Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46, 499 (Aug. 1, 2013). On April 15, 2013, Psychologist Dr. Gail Poyner diagnosed possible "mild Mental Retardation." (TR. 367). Based on the timing of Dr. Poyner's report referenced herein, the Court deems the terms interchangeable for purposes of this opinion.

Subpart P, Appendix 1, § 12.05 (Listing 12.05). And the four "severity" prongs for 12.05 require that the individual demonstrate one of the following:

> (A) Mental incapacity as evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
>
> (B) A valid verbal, performance, or full scale IQ of 59 or less; OR
>
> (C) A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
>
> (D) A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>> (1) Marked restriction of activities of daily living; or
>> (2) Marked difficulties in maintaining social functioning; or
>> (3) Marked difficulties in maintaining concentration, persistence, or pace, or
>> (4) Repeated episodes of decompensation, each of extended duration.

Listing 12.05.

### B. Evidence and Findings Regarding Mr. Spiva's Intelligence

Prior to the administrative hearing, licensed psychologist Dr. Gail Poyner performed a psychological consultative examination on Mr. Spiva.[2] As part of the examination, Dr. Poyner administered the Montreal Cognitive Assessment Test (MOCA). With regard to those results, Ms. Poyner stated:

---

[2] Two copies of Dr. Poyner's report exist in the record—one at Exhibit B4F and one at Exhibit B5F. (TR. 363-367). At the hearing, Mr. Spiva's attorney explained that Exhibit B5F was the corrected version of the report, and the ALJ agreed. (TR. 43). Indeed, that version of the report contains additional findings. Thus, for the purposes of this Order, the Court will reference the corrected report at Exhibit B5F. (TR. 366-368).

> [Mr. Spiva's] MOCA score of 15 is indicative of severe cognitive dysfunction. However, it should be noted that the overall results of this evaluation are inconsistent with his MOCA score, but may be an artifact of lowered intelligence. As such, it is recommended that Mr. Spiva's intellect be tested.

(TR. 367). In her findings, Dr. Poyner's report also stated: "Rule Out Borderline Intellectual Functioning v. Mild Mental Retardation." (TR. 367).

Prior to the hearing, Mr. Spiva's attorney, Jose Blanco, wrote a letter to the ALJ requesting: (1) that Plaintiff be tested for an intellectual disability by an agency doctor in light of Dr. Poyner's recommendation and (2) the hearing be postponed until such testing occurred. (TR. 179). The ALJ apparently ignored the request, as the hearing occurred on the scheduled date and there is no evidence of additional cognitive testing.

At the hearing, Mr. Spiva testified that he "had learning disabilities from day one" and attended special education classes. (TR. 55). Plaintiff did not graduate high school, and did not earn his GED because he could not pass the pre-test. (TR. 56). Mr. Spiva also stated that he had "an extremely bad memory" and "thought processes [were] bad" and that "when he tr[ied] to think of things, a lot of things jump[ed] in [his] brain" which were "hard to filter." (TR. 57).

Approximately two weeks after the hearing, Mr. Blanco wrote a letter to the ALJ stating that he was unable to locate Mr. Spiva's special education records and that he believed the record was incomplete without cognitive testing results. (TR. 316). Accordingly, Mr. Blanco requested that the ALJ order cognitive testing by an agency doctor. (TR. 316). The ALJ disregarded the request, and issued the decision approximately four months later.

In the decision, the ALJ considered Listing 12.05, but rejected it, stating that Mr. Spiva had failed to meet any of the "severity" prongs. (TR. 24-25). With respect to Listing 12.05 (B) and (C), the ALJ simply stated that the claimant did not have the requisite I.Q. to satisfy the listing. (TR. 25).

### C. Duty to Order a Consultative Examination

In cases where a consultative examination is requested, the claimant must first raise the issue to be developed. *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). Specifically, the claimant has the burden to ensure that the record contains sufficient evidence to suggest a reasonable possibility that a severe impairment exists. *Id.* If the claimant is represented, the ALJ may require counsel to identify the issue requiring further development. *Id.* Only then, does the duty shift to the ALJ to order a consultative examination if it is deemed necessary to resolve the issue of impairment. *Id.* In determining whether to order a consultative examination, "The Secretary has broad latitude[.]" *Id.* at 1166.

### D. The ALJ Erred in Failing to Order an Additional Consultative Examination

Mr. Spiva alleges that the ALJ should have ordered a consultative examination for intellectual testing to determine whether he was presumptively disabled under Listing 12.05. In *Hawkins v. Chater*, 113 F.3d 1162 (10th Cir. 1997), the Court addressed a similar claim. There, the plaintiff alleged a heart impairment and presented evidence of an electrocardiogram (EKG). *Id.* at 1165. Based on the EKG results, the physician stated: "Rule out ischemic heart disease" and ordered a treadmill examination for further diagnosis. *Id.* at 1165-66. The claimant attempted the treadmill testing, but

7

was unable to do so. *Id.* at 1166. The claimant saw a second physician and another EKG was ordered. *Id.* The accompanying report indicated that the claimant had "possible inferior ischemia." *Id.*

The ALJ rejected the claimant's contention that her heart condition constituted a severe impairment and the issue before the Court was "what quantum of evidence a claimant must establish of a disabling impairment or combination of impairments before the ALJ will be required to look further." *Id.* The Court noted that "the starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which would have a material impact on the disability decision requiring further investigation." *Id.* at 1167. Once a claimant has sufficiently raised the issue, the Court recognized three circumstances in which consultative testing may be necessary:

(1) where there is a direct conflict in the medical evidence requiring resolution,

(2) where medical evidence in the record is inconclusive, or

(3) where additional tests are required to explain a diagnosis already contained in the record.

*Id.* at 1166. The Court also found that in cases where evidence could not be obtained by the claimant "for reasons beyond [his] control," or where highly technical evidence was needed, a consultative examination is "normally require[d]." *Id.* at 1167.

Ultimately, the Court concluded that the claimant had established the existence of a heart impairment and that in light of the evidence, the ALJ should have ordered further testing. *Id.* at 1169, In doing so, the Court made two pertinent findings. First,

with regard to the initial EKG report, the Court noted that the statement: "Rule out ischemic heart disease" did not mean that the disease had been ruled out, rather that it would need *to be* ruled out, which is why the physician had ordered further testing. *Id.* at 1165. ("If Dr. Ridgill had already ruled out ischemic heart disease, such further testing would presumably have been unnecessary."). Additionally, the Court stated the second cardiologist's opinion that the claimant "may suffer from possible inferior ischemia . . . should have altered the ALJ to the need for more testing, particularly with a claimant who had already had one abnormal EKG." *Id.* at 1169. Based on these findings, the Court reversed and remanded the case for further development of the record to determine the extent of the claimant's heart impairment and its potential impact on her ability to work. *Id.* at 1170.

*Hawkins v. Chater* is controlling in the instant case. Here, Mr. Spiva met his initial burden to establish the existence of a possible intellectual disability. Prior to the hearing, Mr. Spiva underwent a psychological examination and Dr. Poyner performed a cognitive test. (TR. at 366-67). But the findings were inconsistent with the overall results of the evaluation--which Dr. Poyner stated might be attributed to lowered intelligence. (TR. 367). Like in *Hawkins*, Dr. Poyner's diagnosis which stated "Rule Out Borderline Intellectual Functioning vs. Mild Mental Retardation" should not be interpreted as a finding that Dr. Poyner had already ruled out these conditions, but that Mr. Spiva could possibly suffer from either disorder. This conclusion is reasonable, especially in light of the psychologist's recommendation for further testing, similar to the situation in *Hawkins*.

9

In an attempt to supplement the record and forgo additional testing, Mr. Spiva's attorney attempted to locate Plaintiff's school special education records which would have most likely contained evidence of his I.Q. (TR. 316). However, upon being informed that the school did not have the records, Mr. Blanco requested that the ALJ order a cognitive testing to determine Mr. Spiva's intellectual status. (TR. 316).

Faced with the Plaintiff's testimony, Dr. Poyner's diagnosis and recommendation for further testing, and Mr. Blanco's specific request for additional testing, the ALJ should have ordered a second consultative examination to test Mr. Spiva's intelligence. The ALJ failed to do so, however, and this omission constitutes reversible error.

In the decision, the ALJ recited a portion of Dr. Poyner's findings, including the diagnosis which stated: "rule out antisocial personality disorder." (TR. 17). But the ALJ omitted Dr. Poyner's findings of: likely low intellect, possible Borderline Intellectual Functioning, and possible mild Mental Retardation. (TR. 17-18). And nowhere in the decision did the ALJ mention Dr. Poyner's recommendation for further intelligence testing or Mr. Blanco's post-hearing request for the same. (TR. 11-32).

In determining that Mr. Spiva did not meet Listing 12.05, the ALJ concluded that Plaintiff did not satisfy any of the "severity" prongs required by that listing. (TR. 22-25); *see* Listing 12.05 (A)-(D). Specifically, the ALJ found that Plaintiff did not have the requisite I.Q. score to be considered presumptively disabled under Listing 12.05(B) or (C). (TR. 25). But the ALJ's statement was misleading, as the record was devoid of *any* I.Q. score. Dr. Poyner had specifically recommended intelligence testing which would have likely yielded the results necessary to make a definitive finding regarding Listing

12.05(B) or (C). But without the evidence, the ALJ's conclusions are based solely on impermissible conjecture.

In *Warner v. Colvin*, 2014 WL 4437732 (10th Cir. Sept. 19, 2014) (unpublished op.), the Tenth Circuit reached a similar conclusion. In *Warner*, the ALJ had concluded that the plaintiff's mental impairments were not severe, relying, in part, on the report of a mental status examination. *Warner,* 2014 WL 4437732, at 1. But the ALJ failed to mention that the physician who had completed the report had recommended that the claimant undergo further mental testing. *Id.* In light of the recommendation, the Court concluded that a consultative examination was necessary to "explain a diagnosis already contained in the record." *Id.*, citing *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997). The ALJ had discussed the findings from the physician who had recommended further testing, but "either disregarded or rejected" the suggestion. *Id.* In either case, the Court found error, stating that the case should be "remanded for the ALJ to explain the reasons for failing to order the additional tests." *Id.*

*Warner v. Colvin* is persuasive in the instant case. As in *Warner*, the ALJ discussed Dr. Poyner's report, but omitted her recommendation for further intelligence testing. The record contained evidence that Mr. Spiva had attended special education classes in school and Dr. Poyner had speculated that his cognitive testing results might be due to "lowered intelligence." (TR. 367). In light of Dr. Poyner's report and Mr. Blanco's failed attempt to locate Mr. Spiva's special education records, the ALJ should have ordered a second consultative examination for intelligence testing to "explain a diagnosis already contained in the record." *Hawkins*, 113 F.3d at 1166. Only then, could

11

the ALJ make a definitive finding regarding whether Mr. Spiva was presumptively disabled under Listing 12.05. Without an I.Q. score, the possibility could not be ruled out.

**ORDER**

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned magistrate judge **REVERSES** the Commissioner's decision and **REMANDS** the matter for further administrative development.

ENTERED on May 27, 2016.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE